rt. Okay, Mr. White. Thank you. My name is Greg White. I represent the Nevels. For purposes of my argument today, I'm not going to try and dance around the names. The young victim is named Austin, and his mother is Jamie. So if I say those names, you'll know who I'm talking about, and it's short enough time that we can deal with that here. This is a case about discrimination against the disabled. There is a difference between the statutory scheme for disability discrimination than with others. When we read Title VII and Title IX, it is a prohibition only. Do not discriminate. When we read Section 504 and we read the ADA, there's not only this prohibition against discrimination, but there are affirmative duties that persons in the educational context, which 504 deals with, must allow the disabled to participate, and must provide for the disabled educational opportunities, and must not discriminate. We are always tempted, I think, when we look at cases that involve children mistreating children, to draw upon our own experience, where we have seen our history, our children, or our grandchildren's history, and known that kids are mean to other kids. But this case is not about the kids. It is about the adult's response to what they see. And 504 and the ADA say, and I'm of course arguing it here, they tell the adults, when you see children who are disabled being discriminated against, it is your responsibility to stop that, to fix it. It is not a responsibility, perhaps, that we in this room would always think can be a good idea, but for better or worse, Congress has both required it and provided money to do it. So there is little that the adults can say here that absolutely excuses their failures as a matter of law. In this case, the district court had two grounds for granting summary judgment in favor of the school district. I'll paraphrase them because Judge Smith worked apparently very hard, Walter Smith, I'm sorry, worked very hard to write an opinion here. But first of all, the district court said that he was not convinced that the statements, that the actions taken by the adults in this case were related to the disability of Austin. And then second, the district court said that he believed that the school district had made reasonable efforts to address the incidents. Now there are not just a couple of incidents here. The affidavit of Austin and his mother Jamie are included, and they are clear, and they are factual, and they are detailed. We read in those affidavits that Austin had his clothes soaked up so that he couldn't wear them anymore. He had his shoes stolen. He had his brand new shoes that he bought to replace the stolen shoes thrown in a toilet and urinated on. He was slapped. He had rocks thrown at him. He had chemical cleaner sprayed in his face by students. He was kept in a room, and I don't want to make it sound worse than it was, but locked in a room. And you read in there that it wasn't like he was in a jail cell, but he was kept in a room until he urinated on himself. He was told by kids that they were hitting on his shoulders to fix his tics, his spasms that he had because of his Tourette's syndrome. He was knocked off his crutches, which he was wearing for an unrelated broken ankle, and suffered a serious shoulder injury. He was slammed into the wall. He had his pants ripped off, athletic kind of pants, not blue jeans, and he had one other student force Austin's face into the other student's crotch. He also says that I have this condition for which I am being medicated, medicated in part by school district employees who give him his medicine at lunchtime, I mean medicated for what the doctors said at Tourette's. It makes me have spasms. It makes me have tics. You know, I can't help it, and when I have them badly, I can't see, I can't use my hands, I can't speak. It inhibits my ability to read, to learn, and to be productive at school. All that's in the record, and the affidavits that are attached to the response to the summary judgment outline all that stuff. The school says, oh, one, we didn't know he had Tourette's. A nice turn of the phrase, I think, because although the record does not include any doctor's diagnosis given to the school, they were giving him his medication. The teachers saw what happened to him and how he was impacted by this condition that he had, whatever name they chose to give it. To contend, as they did and do in this court, that they did not know that he had a disability is not served well by the record here, nor is it served well by common sense when you look at what Austin and his mother say happened. I noticed that in your reply brief, you did not respond at all or mention the estate of Lance case, which was relied on heavily by the school district. It's a brand new case, as you know, from this circuit. I argued it. So anyway, my question is, do you agree that the Lance case properly sets forth the test? Well, I think it sets forth the test, but Judge Smith, could I point you to another one that is also recent and from a panel here, Carmichael. It's number 11 . . . I'm sorry, number 12-11074, a June 2014 opinion out of this court. It was relied on heavily by Judge Walter Smith when he wrote his opinion. The Carmichael case . . . Well, I want to ask you about the Lance case. You have to understand, my antenna goes up when an appellee relies extensively on a case and then the appellant doesn't even mention it in the reply brief. But Lance really describes this test as one of deliberate indifference, rather than as what you described in the first part of your argument as an affirmative obligation. Do you acknowledge that deliberate indifference is ultimately the test for liability? Absolutely. And I may not have made myself clear when I was talking about affirmative duties. The statute says you have to do these things. The failure to do them must be shown by deliberate indifference. Perhaps that would be better explained from my point of view. We acknowledge that Lance exists, and we acknowledge that it states what the law is in this circuit. But of course, I think that all these cases, Lance, Carmichael, this case, kind of turn on what the record is in front of the court. Carmichael was a case where a young student committed suicide after being called names that directly related to his gender identification and sexual orientation. I mean, they called him a homo. And it was repeated. And they pulled his pants off and turned him upside down in a trash can and put it all out on a YouTube video. And when the courts below dealt with that, they said, oh, well, that YouTube video is just absolutely horrible, and that's really mean. That's only one time. When the court here, this court, reversed Carmichael and sent it back for trial, it because the summary judgment record, I'm sorry, Carmichael was a pleading case. When the pleadings say that parties continuously or daily were impacted by bullying or discriminatory conduct, you have to give credit to the daily or continuous as much as you have to give credit to the most egregious and detailed of the events. So I think the panel in Carmichael, and Judge Dennis actually wrote an additional opinion in addition to the per curiam there, reveals something that's more helpful here, that is that the summary judgment record, and the reason these cases ought to go back for trial is because there is very much to learn from the credibility of both sides and many determinations yet to be made at trial. I think that the district court's determination that these events were not related to the disability begs for a credibility determination. And I say it that way because this is a group of adults who know what all the children are saying, all the names they're calling and all the things that they're doing, and they could be construed to be doing the same thing to Austin. They sent him out of the room 15 times. They told him, don't tattle on people when they say names about you or do bad things to you. Don't be a tattletale. Write this down on a sheet of paper. I will not be a tattletale over and over again. It's really your fault, Austin, that these people are doing this stuff to you because you tattle on them and you fight back when they call you names. You need to just grow up. It is fair for us to conclude that the school district, not adults, actually knew what was going on and they were contributing to Austin's problem as much as his peers were doing so. In addition, the district court concluded that the school district's responses to all of these incidents was reasonable. There is a different inference that can be drawn from the summary judgment evidence here. Children, adults, employers, and administrators like to justify their wrongdoing when they write up their memory of what happened. It often is not what it looked like at the time. It is reasonable to conclude that the school district's explanations that we thought Austin was misbehaving, we thought he was disruptive, could easily be concluded to be we were punishing Austin because he had tics and spasms and he disrupted the class. That is exactly present in the 5th Circuit case, Stewart v. Waco Independent School District. That was a young lady who was sexually assaulted on a number of occasions. The school district's response to that was, well, you need to just not be at school. She was a little bit mentally impaired. The school district's attitude was, well, she invited it or didn't mind it or it was a little bit of a mistake, but of course her mind was not really sufficient enough to understand what was going on. Their response to it was, well, you just need to go home and not come to school because you're not acting right where you're at school. They said in their appeal, see, we're just dealing with disciplinary issues. The reality was they're dealing with a disabled person in a way that the law doesn't let them. You don't deal with disability problems by saying, go home, go sit in the hallway, go do something else. Those cases follow the pattern that we see in Reeves v. Sanderson Plumbing. That is, you've got a plaintiff that says, I've got my discrimination case. The defendant comes in and says, here's my response to it. And the plaintiff says, well, I think it's all pretext. The Supreme Court says, all that evidence remains on the table. You can't just take the defendant's explanation, believe it, and grant summary judgment. We also get instruction from Tolan v. Cotton, a recent case out of this court, where the Supreme Court reminded us that witnesses on both sides come to a case with their own perceptions, recollections, and even potential biases. It is for that reason that we have jury trials. And Carmichael, I think, also is instructive there. Discrimination cases, no matter what they involve, are rarely marked by the smoking gun. They are more often proven by circumstantial evidence. And I think that this case certainly begs for the opportunity for someone to decide who is telling the story in a credible fashion, who, in the universe of facts that we know is telling a story that is believable. And it does not offend our sense of justice to believe that juries should decide this case. I'll yield the rest of the time. I've saved some for rebuttal. Yes. You've saved time for rebuttal. Thank you, Mr. White. Ms. Robinson? May it please the Court, I'm Bridget Robinson representing the Defendant Appellee Marked Independent School District. With me is the principal of Mark Middle School, Dr. Tanya Nell, whose affidavit appears in the Record on Appeal of this case, as well as her contemporaneous documentation of the events about which plaintiffs complain. Your Honors, the District Court's very well-reasoned decision granting summary judgment to the Mark Independent School District should be affirmed for a plethora of reasons. The District Court properly found that the Mark Independent School District was not deliberately indifferent to any known disability-based harassment of A.N. Similarly, the District Court correctly held that even accepting as true plaintiff's allegations of temporary and sporadic removal from the classroom approximately 15 times over a two-and-a-half year period based on what A.N. himself admitted was his own disruptive behavior did not result in the deprivation of benefits of services, programs, or activities of the Mark Independent School District. For those reasons alone, the District Court's decision should be affirmed. It is clear in analyzing the causes of action pled by plaintiffs under both Section 504 and the Americans with Disabilities Act that the plaintiffs cannot establish a prima facie case or show the imposition of liability because they can't meet any of the elements required in this particular case. As this Court is well aware, under Lance mentioned by Justice Smith, plaintiff has to show that he was an individual with a disability. He was harassed based on that disability. The harassment was sufficiently severe or pervasive that it altered the condition of his education and created an abusive educational environment. The defendant knew about the disability-based harassment and the defendant was deliberately indifferent to the harassment. Plaintiff mentioned in the briefs and again today that the alleged disability in this case is Tourette's Syndrome. However, it is clear from the documentation before the District Court and in the record on appeal that there was no evidence ever presented to the school district that A.N. had Tourette's Syndrome or any other disability. The plaintiffs claim that the school district had to have known that A.N. allegedly had Tourette's Syndrome because they gave him medication. However, it's clear from the enrollment forms that Mrs. Neville submitted to the school district that there was never any medication listed for Tourette's Syndrome or any indication that A.N. had Tourette's Syndrome. Instead, when A.N. was enrolled in fifth grade, Mrs. Neville filled out his enrollment form and said that A.N. was taking Clonidine and mentioned or wrote that his ailment was asthma. In his sixth grade year, Mrs. Neville wrote that A.N. had tics but listed no medications he was taking. In his seventh grade year, which was also the year that A.N. was ultimately withdrawn from the Mark Independent School District, Mrs. Neville wrote that A.N. was taking Guanfacine but that the ailments she listed were only allergies and asthma. So the only two years of Mark Middle School enrollment forms that A.N. had medication prescribed for him, it was the fifth grade year for asthma and the seventh grade year for allergies and asthma. Although on the sixth grade enrollment form, Mrs. Neville wrote that A.N. had tics, there was never anything noticeable about A.N. that anyone thought could actually have been tics. As a matter of fact, as you see from the affidavits of A.N.'s teachers, such as Mr. Lehrman, A.N. never had any tics or unusual facial movements. We are talking about summary judgment, it seems to me there is some evidence here just from the way the kids, other kids reacted to them with some of the descriptive names they used against him, that there was contrary evidence that he had these spasms, that he had some sort of tics. You know the summary judgment evidence better than I do, isn't that in the record as well? There were never reports at the time A.N. was enrolled in the Mark Independent School District that any student called him the names that they now claim in the lawsuit and on this appeal. For example, there is an allegation and A.N. signed a declaration claiming that he was called spaz and twitch, but there is nothing other than his unsupported allegations and his own self-serving declaration that support that allegation. We have contemporaneous documentation of everything that was reported during the time A.N. was a student at Mark ISD and there are some name calling incidents, but when you look at those incidents, they were all explained, all investigated and prompt remedial action was taken. We have some pretty definitive circuit law that says that unilateral self-serving declarations in affidavits can be sufficient to defeat summary judgment, in other words they count as evidence just as contravening affidavits might. Well self-serving affidavits alone are insufficient as this court is aware under Cedar Hill, however the district court not only viewed the evidence in the lot most favorable to plaintiffs regarding the alleged disability, the district court went a step further and actually accepted as true plaintiffs allegations of a disability. However, it is not clear even today that A.N. has Tourette's syndrome because the only documentation in the record was submitted to the Mount Calm Independent School District, which A.N. currently attends in 2013, more than a year after he was withdrawn from the Mark Independent School District, in which A.N.'s doctor said that he had attention deficit hyperactivity disorder, tick syndrome and developmental coordination disorder, that's at page 639 of the record on appeal. However, it's uncontroverted and undisputed that that documentation not only was more than a year after he had withdrawn from the Mark Independent School District, that information was never provided to the Mark Independent School District, nor was any documentation ever provided that he had any sort of disability at all. In that letter, Dr. Hall, when explaining anything that might affect his educational progress at Mount Calm Independent School District, said that the attention deficit hyperactivity disorder might distract A.N. and lead him to a lack of focus and it might affect his learning ability, and that was the primary diagnosis, nothing having to do with Tourette's syndrome. It is clear, even looking at plaintiff's own self-serving affidavits, or in this case declarations, that there was no information provided to the Mark ISD that A.N. had Tourette's syndrome. In fact, in her declaration, Ms. Nevels merely claimed that she gave a school secretary a note to pass to the nurse that A.N. was prescribed clonidine for his tics in the fall of 2008. In the fall of 2008, A.N. was at Mark Elementary School, not even at Mark Middle School. However, on the enrollment form for fifth grade, Ms. Nevels noted that the clonidine was for asthma. There is nothing in the record on appeal in this case that shows such a note was actually given that the medication was for tics, or that there was any change in medication due to tics. And there is nothing that indicates that the school district was aware of any behavior that would show that A.N. had Tourette's syndrome, or that he had any sort of tics. However, assuming, as the district court did, that plaintiff's allegations are correct in that regard, plaintiffs have not shown any deliberate indifference on behalf of the school district. If you look at all of the incidents that were actually reported, including the name-calling incidents, when A.N. was enrolled in the Mark Middle School, none of those were disability-based. There was an incident, which was investigated and remedial action was taken, where A.N. and another male student both said that the other looked retarded. But upon investigation, Dr. Now found out that one student called the other or said that the student looked retarded because he was wearing a shirt tucked in with no belt, and the other student similarly responded because the student was wearing tennis shoes instead of boots. So the comment about looking retarded had solely to do with the clothing that the students were wearing had nothing to do with any alleged disability. There were other name-calling incidents, not as plaintiff now asserts after the fact, such as Twitch, which was never reported, but there was an incident, for example, in which A.N. was standing too close to a female student, and in order to get A.N. to move out of her personal space, the female student turned to him and said, boo. Rather than moving out of her personal space, A.N. called her a booty licker. Both students were counseled, and there were similar incidents. There were reports that A.N. was referred to as lawsuit at a time after there was a had gotten on the phone with another student, cursed at the student, had threatened that student with physical violence, and had threatened to turn that student into the police for telling A.N. to get off the phone, after which point there was a reference to A.N. as lawsuit. But there were also references by A.N. to other students, such as booty licker, he called an episode in which he called a student an elfin bee, except he used the actual profane terms rather than using the restricted terms. There was another incident in which A.N. told a student to shut up during class, and the other student said, oh, that's a put-down word, which in their declarations, A.N. now characterizes as being something that was said on the basis of disability, but that situation was diffused by the teacher in the room, Ms. Allen, who said that they could continue their argument in the office, or be quiet and get back to work, and they were able to settle down and get back to work. The physical altercations in which A.N. was involved at the school district involved other types of incidents, which also showed no disability-based animus at all. For example, there was an incident on the football field at one point, where A.N. made some rude comments to a student who told A.N. not to talk to him, at which point A.N. went over to that student, made a fist, and extended his arm and put his fist on the student's chest. That student knocked away A.N.'s arm, at which point A.N. took his fist and hit the other student, and then that student slapped A.N. Both those students were counseled about their behavior, and they both received punishment as a result of that incident. There was another incident in which A.N. went in the locker room, turned off the light switch, and stood in front of the light switch, so when another student tried to turn the lights back on, the student tried to move A.N. out of the way, and A.N. hit him, and the student responded in kind, and they were both punished and received ISS for fighting. So there were incidents, all of which were investigated, and in which prompt remedial action was taken because of the disciplinary infractions involved. The plaintiffs in this case complain about many incidents, including an incident in which Mrs. Nevels called Dr. Nell at home at night one evening, and claimed that A.N. had been hit in the shoulder by another student. Although the plaintiffs claim that the shoulder injury was caused at school, it's clear that the shoulder injury was not caused at school. As a matter of fact, there is, in the record at page 263 in ER, a note from Mrs. Nevels claiming that A.N. had dislocated his shoulder, and they were in the emergency room until 4 a.m. We know that incident did not happen at school, as shown on the record at page 403, paragraph 25. However, because of the report to Dr. Nell by Mrs. Nevels that A.N. had been hit in the shoulder, even though the shoulder injury had not happened at school, we don't know if it happened in the outside peewee football league, the outside baseball league, or the youth rodeo in which A.N. participated. Dr. Nell took it upon herself to initiate a bullying investigation to determine what had happened. What she found had happened as a result of that bullying investigation was that while playing a vocabulary game, A.N. was eliminated from the game and sat in another student's chair. That student, P.A., was a student with whom A.N. evidently held a grudge because that student had accidentally stepped on A.N.'s jacket the week before while it was in the floor in the gym room. At the end of class that day, A.N. said to P.A., bye-bye, and tried to shoulder into him, but P.A. turned so A.N. would miss him, and P.A. hit A.N. in the back of the shoulder after he had hurt his shoulder. Dr. Nell found that there was bullying as a result of this investigation, even though the entire situation seemed to have been caused because of the accidental stepping on the jacket the week before. Because she found that P.A. had bullied and been inappropriate toward A.N., she not only punished P.A., suspended him, she also took other measures to try to make sure nothing like that would ever happen at the school district again. To address the conflicts, Dr. Nell scheduled teacher training on bullying for all of Marr I.S.D. teachers, which was conducted by Voices Incorporated on February 21st, 2011. In addition, there was a student presentation on bullying, which was conducted for the fifth and sixth grade boys on February 25th, 2011. Dr. Nell also made a plan to bring Rachel's Challenge to the school, which was a program designed to teach kindness and compassion to the students, and was presented on September 21st, 2011, to the school district. All of those things that were done, the remedial action that was taken, the bullying investigations, all of the disciplinary action imposed against students, as well as the training for students and for staff, was in addition to the policies that the school district maintains, which prohibit discrimination on the basis of disability, among any other protected characteristic, provide equal educational opportunity, and provide for anti-bullying rules, and allow plaintiffs to file any complaints they want with the ADA 504 Title IX coordinator or Marr ISD Board of Trustees, which the district court properly found plaintiffs never did. All of those policies are in the Record on Appeal at pages 313 through 352, but none of those were used by the plaintiffs in this case. Plaintiffs also complain about an incident in which they claim A.N. was sprayed in the classroom. A.N. reported as an accident in Mr. Lerman's class. As a matter of fact, when he was asked how he got the spray in his eyes while the students were cleaning their desks, A.N. told Mr. Lerman that he didn't know, and then he told Wendy Cobbs, who was the school secretary and helped him wash out his eyes, that it was an accident, and thus an accident report was filled out. Even plaintiffs admit that they never reported the spray sanitizer as an intentional act, and that's shown in the Record on Appeal at page 171, admission number 4. So the things they complain about now either didn't happen at all, or did not happen the way that plaintiffs allege. However, even when you look at what plaintiffs admit occurred, it is clear that the school district was not deliberately indifferent in this case, and the district court properly held. For all those reasons, as well as those articulated in the brief, the district court's well-reasoned decision should be affirmed. All right. Thank you, Ms. Robinson. Mr. White, you've saved time for rebuttal. The case then presents, who do you believe? Do you think that the school district has explained this well? Do you think that their story is better and more believable? Do you think that it's more detailed? If that is the thought process, then this is not a summary judgment. This is a trial, because that's what juries decide. Who is more believable? Whose story fits the known facts better? Who is more credible about what they are saying? All, and it's just blatantly obvious, all affidavits at summary judgment are self-serving. That's the point of putting in your own proof and writing up your own affidavits. It's self-serving because nobody gets to cross-examine your affidavit. Nobody gets to judge the people who are signing these papers. That's all reserved for trial. It's unfair to conclude that one side has made self-serving affidavits and the other has not. That simply begs a court like this court to decide that one side's story is better than the other. It is also important to realize that what we are asking here is that the court decide whether to believe that some party's assertions about state of mind or intent are to be believed. It is hardly surprising that a party that has been accused of being indifferent or intentionally doing wrong would be able to put in affidavits that say, no, I was not indifferent. No, I was not intentionally wrong. But the courts have traditionally been reluctant to decide issues of state of mind on summary judgment. And I just refer the court back to that Tolan case that says everybody is going to come to these things with a different perception, a different recollections, and they're going to present them in a way that they want them to be decided. I mean, which one is more credible? There is a rather remarkable argument, and this will be the last thing that I'll take up, that none of the incidents are disability related, which I think ignores, ignores totally, the evidence that Austin said that I was daily called a spaz, a tick, a retard, tick-tock, and things like that. To believe that none of the events had anything to do with that name calling, that there was some wall of separation between what they called him at one point in time and what they did to him at another, makes no sense. It is far more sensible in the scheme, I mean, everyone's experience to understand that when children call each other names, there's going to accompany it physical conduct, or perhaps even from Austin's viewpoint, a reaction to it. To then believe that this has been going on for two and a half years and no administrator ever saw any of it happen, also is completely out of line with the summary judgment evidence. Jamie? But there was nothing in the record to definitively indicate the presence of a disability, right? I mean, all these prescription records and things, have those been accurately described to us? Their records, they have described their own records accurately, but there's no doubt that teachers knew that Austin did the things that he said. That is, I had spasms. At times, I could not do anything related to my schoolwork because the ticks that I had were so bad. To believe that teachers didn't know that that was a medical problem, belies reality. You can't imagine... Well, but doesn't it believe reality that if there was a significant disability of any kind and prescriptions being given, that the school would have been provided records of some kind of a diagnosis or some reason other than things like allergies and asthma for the prescriptions? You can go ahead and answer that. I don't think that everyone, every parent understands that they have an obligation to tell the school district every medical problem and every diagnosis their child has ever received. If they've gone to school and said to the nurse, here is the medicine my son needs. Would you give it to him at lunch? And it's for allergies and asthma, right? Well, she also said it was for ticks, but regardless of what she says it's for, if the teacher sees what is going on, that is, that the kid has spasms and ticks all the time, you can't say that they have no idea that that's a medical problem. All right. Thank you, Mr. White. I think Judge Wrigley wanted to mention something. Let me say this to the council. I decided a long time ago doing this, and I've been doing it a long time, how important it is for appellate judges to read the record of the case below. I think we fail at that point more often than we fail anything else. Even though competent lawyers argue and write briefs, and both of you not only are competent, but you have shown it, displayed it by your arguments today. You certainly know your records, and you bring your cases forward well. I just want to assure both of you that in this case, at least one of the judges on this panel is going to read every page of the record. Thank you. All right. Your case and all of today's cases are under submission, and the court is adjourned.